J. S02001/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.D.G., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.M.W., MOTHER | : | No. 2386 EDA 2018 |

Appeal from the Decree Entered July 19, 2018,
in the Court of Common Pleas of Bucks County
Orphans' Court Division at No. 2018-a9052

| | | |
|---|---|---|
| IN RE: J.D.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.M.W., MOTHER | : | No. 2408 EDA 2018 |

Appeal from the Decree Entered July 19, 2018,
in the Court of Common Pleas of Bucks County
Orphans' Court Division at No. 2018-a9053

BEFORE: GANTMAN, P.J.E., KUNSELMAN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED FEBRUARY 21, 2019**

N.M.W ("Mother") appeals from the July 19, 2018 decrees entered in the Court of Common Pleas of Bucks County Orphans' Court Division involuntarily terminating her parental rights to her dependent children, J.D.G., male child, born in October of 2008, and L.D.G., Jr., male child, born in September of 2012 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).[1]  We affirm.

---

[1] Pursuant to Pa.R.A.P. 513, this court **sua sponte** consolidated these appeals because they involve related parties and issues.  (Order of court, 9/6/18.)

The orphans' court set forth the following:

> [Bucks County Children and Youth Social Services Agency ("Agency")] first received a referral regarding this family in September 2010. Between 2010 and 2013, the Agency provided general protective services to the family. In December 2013, dependency petitions were filed, and on August 13, 2014 both [C]hildren were adjudicated dependent. The Children were placed in the legal custody of a maternal aunt until September 8, 2014, when an emergency custody Order placed the Children in the care of the Agency. A shelter care hearing was conducted on September 15, 2014. The Children were then in the care of the Agency for twenty-three (23) consecutive months. On August 3, 2016, the Children were returned to the care of Mother; however, shortly thereafter, on September 13, 2016, the Children were returned to the care of the Agency. They have remained in the Agency's care since that time. In total, then, the Children have been out of Mother's care for approximately forty-five (45) months of the past forty-six (46) months, except for the brief period in August and September 2016.
>
> Unfortunately, Mother has failed to remedy the difficult circumstances that originally caused the Children to come into the care of the Agency, particularly with regard to extremely unsuitable housing conditions, and she has failed to adequately comply with the Permanency Placement Plans that the Agency designed for her. On May 16, 2018, the Agency filed the subject Petitions for the Involuntary Termination of Mother's Parental Rights under § 2511(a)(2), (5), and (8) of the Adoption Act. On August 10, 2018, Mother filed a timely appeal in the

> Superior Court from our July 19, 2018 Decrees.[Footnote 2][2]
>
> > [Footnote 2] Despite this being a fast track appeal pursuant to Pa.R.A.P. 1925(a)(2), the [orphans' c]ourt was delayed in receiving the official transcript of this hearing due to unexpected medical difficulties suffered by th[e orphans' c]ourt's stenographer. Immediately upon receipt of the transcript, the [orphans' c]ourt promptly addressed this appeal.

Orphans' court opinion, 10/12/18 at 1-2 (citations to notes of testimony omitted).

> [At the termination of parental rights hearing,] [w]e heard the testimony of Ericka Way, the Agency caseworker who became involved with this family in February 2018.[Footnote 4]  Ms. Way testified regarding more than twenty (20) visits to Mother's home between 2011 and 2018.  The first visit occurred on September 28, 2010.  That was an unannounced visit to the home following the referral that was made

---

[2] The record reflects that Mother simultaneously filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Thereafter, the orphans' court filed its Rule 1925(a)(2)(ii) opinion.

We further note that the orphans' court noted that:

> the biological father ("Father") did not appear at the hearing, although his court-appointed counsel was present.  The Agency has had no contact with Father since November 2016.  He has not sought assistance from the Agency, nor has he been an active resource for the Children.  Decrees granting the Agency's Petitions to Terminate Father's Rights as to both Children were signed on July 19, 2018.  Father has not filed an appeal.

Orphans' court opinion, 10/12/18 at 1 n.1.

to the Agency about this family. The house was found to be "cluttered and filthy," with no food in the home and ants crawling on a high chair. Upon these discoveries, the Agency assisted by providing cleaning supplies.

> [Footnote 4] The caseworker formerly involved with this family is no longer employed by the Agency.

Over the years, the majority of the visits to Mother's home were scheduled visits, yet Ms. Way testified that upon entering the home, it was consistently found in the same cluttered and filthy condition. Mother was repeatedly informed that she needed to clean the home. The Agency notes through the years included descriptions such as filthy, smelling of human and dog urine, dog feces in the home, trash on the floors throughout the home, food on the floor, ants, and a fence around a swimming pool that remained unrepaired. During an announced visit on November 20, 2013, Mother refused to show the caseworker where the Children slept. During an unannounced visit on August 4, 2015, the caseworker discovered the family was sleeping in the basement due to oppressive odors upstairs in the home. The inability to breathe clean air in the home was always of particular concern to the Agency due to both Children suffering from asthma.

Ms. Way testified about exposed nails in the home, choking hazards on the floor, cleaning products and spray paint within reach of the Children, and medicine bottles not safely situated. During one visit a caseworker had to step outside the home and became ill due to the extremely foul odor inside. One week later, on September 1, 2016, the caseworker arrived for a scheduled visit and observed a basement that smelled of urine, no sheets on the beds, debris all over the floors, and urine filled bottles into which Mother had the Children urinate. Mother refused to allow the caseworker to photograph the conditions. The caseworker attempted an unannounced visit on February 28, 2018. Although no one answered the

door, the caseworker recognized a strong smell of urine from outside the door.[Footnote 5]   Ms. Way testified Mother has never informed the Agency that she cleaned the home and requested the Agency to reassess the living conditions, nor did she inform the Agency that she was living elsewhere, in a cleaner and safer environment for her and the Children.

> [Footnote 5] During this period Mother, and when relevant, the Children, lived with the maternal grandfather and great-grandfather.      The Agency caseworkers encountered similar unacceptable, unsanitary conditions wherever Mother resided with her Children.

We also heard the testimony of Desiree Mullen, the Agency supervisor involved in this case between February 2016 and February 2018.   Ms. Mullen testified that the most significant concern to the Agency was that for years, Mother did not have an appropriate living environment for the Children, and that for many months Mother refused to allow the Agency to enter her home.  The poor condition of the home was so extreme that it was referenced in Agency notes as "deplorable."   Ms. Mullen testified that Mother had discussed obtaining full-time employment for herself and new housing for the Children since 2014, but had accomplished neither.[Footnote 6] Despite the Agency repeatedly informing Mother during eight (8) years of Agency involvement, that she could and should improve the environment in which Children lived by cleaning the home, Mother failed to do so.  Ms. Mullen testified that the only explanation Mother shared during the time the Children lived in her father's home, was that no one else helped her with housecleaning.

> [Footnote 6] Mother gave birth to another child in November 2017, about two weeks after she had informed the Agency of her pregnancy.  That child is being cared for

by the paternal grandmother and great-grandmother.

The Agency was concerned that Mother's conduct may have been associated with mental health issues, and suggested to Mother as early as 2012 that she should pursue a mental health evaluation. Mother failed to consistently participate in mental health treatment. Mother would provide the Agency a verification of an evaluation but then no further proof of treatment. Mother refused to sign releases for the Agency to access any related mental health information. Ms. Mullen testified that twice Mother failed to appear for treatment appointments. In June 2014 Mother informed the Agency that she was not receiving any treatment.

In September 2014, Mother agreed in Dependency Court to seek a psychological evaluation. In 2016, Mother reported attending counseling, but she would not sign a release or inform the caseworker where she was allegedly receiving treatment. In 2017, Mother informed the Agency that she was not receiving counseling, and in February 2018, she reported receiving therapy at Penndel Mental Health. Given Mother's unwillingness to comply in this regard, the Agency has no better insight today than it did in 2012 as to whether or not Mother's mental health status impacts her ability to obtain and maintain appropriate housing.

Ms. Mullen testified about the services the Agency has provided Mother at various times during the past eight (8) years. Those services included assistance with housing, employment, and family services to aid in prevention of the Children having to be removed from the home.

One example about which Ms. Mullen testified was Mother's noncompliance at a housing group shelter to which the Agency had referred Mother in 2013. Mother was discharged from that program due to the lack of cleanliness of her room which rendered the conditions inappropriate and unsafe for the Children.

Additionally, Mother had not followed through with expectations regarding her own mental health and services for the Children.

Mother also failed to effectively engage in parent education. Ms. Mullen testified that "most, if not all" of the parenting referrals for Mother were not successfully completed by her, and were terminated by the Agency's contractor due to Mother's refusal to participate. Ms. Mullen observed that Mother participated in the LINKS Family Services Association program "intermittently."

Mother has represented to the Agency that she has part-time employment. Mother did not provide documentation of that employment to the Agency, nor has she ever reported full-time employment.

Ms. Mullen also testified about the family group decision making meetings that were conducted in this case. She believed at least two meetings occurred which were attended by her and the caseworker, along with Mother, Mother's brother and his fiancé/wife, and Mother's father. The causes that brought the Children into the care of the Agency, and how those circumstances could be improved, were discussed. Included were the need for Mother to make the home safe for the Children, and for Mother to increase her hours of employment. Mother understood the tasks she needed to accomplish in order for the Children to potentially return to Mother's home in August 2016, and she acknowledged that this was an important opportunity for her to exhibit improvement. Ms. Mullen recounted the tasks as follows: "[t]o keep the house clean and appropriate, free of clutter, trash, urine, feces, to increase her work hours which were floating around 10 hours a week . . . for her to follow through with mental health." Mother was also to enroll L.D.G., Jr. in daycare and J.D.G. in school. In anticipation of the Children's return to Mother's home, the assigned Agency caseworker assisted Mother in cleaning the home, disposing of trash and clutter, removing unsafe items, and

discarding uneaten food that remained around the home.

Ms. Mullen testified that the caseworker visited Mother's home shortly after the Children returned there in August 2016. Mother had not enrolled the Children in school or daycare, despite the Agency providing funding for the daycare. Mother had returned the Children to wearing pull-ups and urinating into bottles, and again there was food and garbage strewn about the floors.

Due to significant concerns regarding the Children's well-being during this six (6) week return to Mother's care, an emergency Order was entered returning the Children to the care of the Agency. The Children were returned to the foster family with whom they had previously resided. The Children's physical health, cleanliness, and social skills had deteriorated during their return to Mother's care. The foster mother had to re-educate the Children on properly using a bathroom, not throwing trash on the floor, eating properly, and using utensils. Additionally, J.D.G. was enrolled in school.

*Id.* at 7-12 (citations to notes of testimony omitted).

Mother frames her issues on appeal as follows:

1.  [Did the orphans'] court abuse its discretion when it determined that Mother's failure to clean proves incapacity, abuse, neglect or refuse [sic] so as to cause the children to be without essential parental care, control, or subsistence necessary for the children's physical or mental well being as required under Section 2511(a)(2)?

2.  Did the [orphans'] court abuse its discretion when it determined that termination of parental rights best served the needs and welfare of the children as required under Section 2511(a)(5) and Section 2511(a)(8)? [sic]

Mother's brief at 8.

At the outset, we note that Mother fails to specifically challenge the orphans' court's determination under Section 2511(b) in her statement of questions presented. In light of the requisite bifurcated analysis set forth in Section 2511 of the Adoption Act, however, we excuse Mother's inartfully framed issues because that statute requires us to review the developmental, physical, and emotional needs and welfare of the child in termination cases. We, therefore, begin our review.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, 9 A.3d [1179, 1190 (Pa. 2010)].

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**,

855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

As previously stated, the termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first

> initiated subsequent to the giving of notice of
> the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, Mother claims that the orphans' court abused its discretion when it terminated her parental rights "for allegations of bad housekeeping and poverty related to inability to obtain Agency approved housing for herself and the Children." (Mother's brief at 16.) Despite Mother's contention, the orphans' court terminated Mother's parental rights because it:

> found that there was ample evidence to justify the termination of Mother's parental rights to the Children, pursuant to Section 2511(a)(2). The period during August-September 2016, when the Children returned to Mother's home, strikingly demonstrated Mother's "incapacity" under (a)(2) as to remedying the significant parenting problems that brought the family to the Agency's attention eight (8) years prior, in 2010, and which later required the Children to be brought into Agency care in 2013. These incapacity factors included, most significantly, Mother's unsafe housing, along with her reluctance to obtain full-time employment, and her failure to address potential mental health issues.
>
> Mother failed to cooperate with the many services provided by the Agency over many years. Additionally, Mother failed to utilize the assistance provided by the Agency as a catalyst for improved parenting, such as being provided with cleaning supplies and the caseworker physically assisting in cleaning the home. Unfortunately, shortly thereafter, Mother allowed the home to lapse into unsafe and unhealthy conditions.

Orphans' court opinion, 10/12/18 at 12-13.

We have carefully reviewed the record and conclude that it supports the orphans' court's factual findings and that the orphans' court did not abuse its discretion in terminating Mother's parental rights under Section 2511(a)(2). The record demonstrates that the conditions that existed upon removal

establish repeated and continued incapacity, abuse, neglect, or refusal of Mother that caused the Children to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, the causes of which Mother cannot or will not remedy.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well.   Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 73 A.3d at 268.   The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269.   The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly.   When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In determining that termination of Mother's parental rights favored Children's needs and welfare, the orphans' court opined:

> The court-appointed legal directed counsel for Children shared that J.D.G. wanted this Court to be aware that he enjoys his visits with Mother and would like to see her more. Though legal directed counsel expressed that J.D.G. did not seem to appreciate the full meaning of termination or adoption, counsel stated: "I was able to glean that [J.D.G.] didn't think it was particularly a good idea . . . to go home and live with Mom at this time." Counsel expressed that the younger child, L.D.G., Jr., did not seem to comprehend these proceedings and any impact on his future. He did state that he enjoyed living with the foster family, but like J.D.G., enjoyed his visits with Mother and would enjoy being able to visit more.
>
> We have no doubt that Mother loves the Children and that they love her. Unfortunately, the record contains clear and convincing evidence that Mother has not made reasonable or responsible strides toward adequately being able to parent the Children. The evidence presented overwhelmingly suggests that Mother, over the course of many years with the Agency's active involvement, has refused or been otherwise incapable of providing adequate housing and support for herself or the Children.
>
> "[T]he court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *See M.E.P.*, 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted). Here, Mother has repeatedly failed to remedy her parental incapacities. When these considerations are balanced against the Children's needs for permanence and stability, this Court reluctantly but firmly concluded that it was in the best interests of L.D.G., Jr. and J.D.G. to grant the Agency's Petition to Terminate Mother's Parental Rights.

Orphans' court opinion, 10/12/18 at 16-17 (footnote 9 omitted; record citations omitted).

Additionally, our review of the record demonstrates that Desiree Mullen, the case supervisor from February 2016 to February 2018, testified at the termination hearing. (Notes of testimony, 7/17/18 at 9-10.) Ms. Mullen testified that after the Children were adjudicated dependent, they were placed in the custody of their paternal aunt in August 2014. (*Id.* at 19-20.) On September 8, 2014, an emergency custody order was entered and the Children were placed into the Agency's care. (*Id.* at 20.) They remained in Agency care for 23 months where they spent time in two different foster homes. (*Id.* at 22-24) On August 3, 2016, the Children were returned to Mother. (*Id.*) On September 13, 2016, the Children were returned to Agency care, where they have remained. (*Id.*)

In September 2016, the Children were returned to the foster home that they had been in prior to being returned to Mother. (*Id.* at 23-24.) They remained in that foster home until approximately June 2017. (*Id.*) At Mother's suggestion and following vetting, the Children were placed into the home of a kinship resource. (*Id.* at 24-25.) Less than two months later, that kinship resource returned the Children to the Agency due to the Children's behavioral issues. (*Id.* at 26.) The Children were then returned to the prior foster home where they remained until June 2018. (*Id.*) In June 2018, the Children were placed in a long-term resource foster home. (*Id.*)

Ms. Mullen testified that the Children are flourishing in their current foster home and that the foster family is committed to meeting the Children's needs and have expressed their desire to be an adoptive resource. (*Id.* at 29, 31-32.) Ms. Mullen further testified that termination of Mother's parental rights would best serve the Children's needs and welfare, as well as solidify their relationship with their foster family. (*Id.* at 32-33.) Ms. Mullen also testified that even though the Agency recognizes that the Children have a connection to their Mother, the Children have been in Agency care for nearly four years and the Agency believes that their need for permanence outweighs that connection. (*Id.* at 35-36.)

The record further reflects that the Children's legal representative, Timothy Barton, Esq., met with the Children individually and together on July 11, 2017. (*Id.* at 142.) J.D.G. stated that he enjoys spending time with Mother and that he also enjoys living with his foster family. (*Id.* at 143.) On the basis of the answers J.D.G. provided to Mr. Barton's questions, Mr. Barton concluded that J.D.G. did not believe it was a good idea that he be returned to his Mother. (*Id.* at 143-144.) L.D.G. stated that he "love[s]" to see his Mother but that he liked living with his foster family. (*Id.* at 144.)

In balancing the Children's needs for permanence and stability against Mother's claims of progress and hopes for the future, the orphans' court "reluctantly but firmly" concluded that the Children's needs and welfare were

best served by termination of Mother's parental rights. After carefully reviewing the record, we find no abuse of discretion.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Mother's parental rights under Sections 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/19